Filed 7/22/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TOM SHELTON DOANE,<br><br>    Defendant and Appellant. | A153709<br><br>(San Mateo County<br>Super. Ct. No. 16-SF-003726) |

Defendant Tom Doane lost control of his truck and collided head-on with a vehicle driven by Francis Jouaux, killing him. Doane fled on foot and was not apprehended until the following day. A jury convicted him of one count of vehicular manslaughter with gross negligence, with an enhancement for fleeing the scene, and a separate count of leaving the scene of an accident. He was sentenced to 11 years in prison.

At trial, the key disputed issue was whether Doane acted with gross negligence, as he conceded he acted with ordinary negligence and was thus liable for the lesser included offense of vehicular manslaughter without gross negligence, a misdemeanor. On appeal, he claims his vehicular-manslaughter conviction must be reduced to the lesser offense because of insufficient evidence, prosecutorial error, and a mistake by the trial court in answering a jury question. He also claims that both the enhancement and

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A. and II.E.

conviction for leaving the scene must be reversed because the trial court erred by failing to instruct sua sponte on the affirmative defense of unconsciousness.

We conclude that sufficient evidence supported the conviction of gross vehicular manslaughter and a jury instruction on unconsciousness was unwarranted. But we agree with Doane that the prosecutor misstated the law involving circumstantial evidence in closing argument and that the trial court incorrectly answered a jury question about the use of post-crash conduct to find gross negligence, and we conclude these two errors were collectively prejudicial. Accordingly, while we affirm the conviction for leaving the scene, we reverse the conviction for gross vehicular manslaughter. The People shall have the option to retry Doane for this offense. If the People elect not to do so, we direct that the judgment be modified to the lesser included offense of misdemeanor vehicular manslaughter, to which the enhancement for fleeing the scene does not apply.[1]

_____

[1] In light of our disposition, we need not address Doane's remaining claims that the trial court erred by (1) precluding his reliance on a traffic survey report showing prevailing speeds on the highway in question; (2) not instructing the jury that gross negligence requires more than merely driving under the influence or violating traffic laws; (3) misinstructing on the intent requirement for misdemeanor vehicular manslaughter; (4) misinstructing on the required union of act and intent as it applies to gross vehicular manslaughter; and (5) imposing the upper term for that crime. We also deny his request for judicial notice of three traffic-related documents relevant to the first issue as unnecessary to our decision. To the extent any of these documents might also be relevant to whether his driving was objectively unsafe, we conclude it is inappropriate to rely on them in determining whether there was substantial evidence of gross negligence.

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

### A.    *The Crash*

The crash occurred around 7:00 p.m. on Easter Sunday, March 27, 2016.  That afternoon, Jouaux, who was in his mid-40's, and a friend went kitesurfing at the beach.  After a few hours, they left in separate cars to drive home to La Honda.  The friend followed Jouaux, who drove an early 1990's Honda Civic, as they proceeded up Highway 1 and then headed east on Highway 84.  It was still light outside, and conditions were clear and dry.

A California Highway Patrol (CHP) officer described the relevant stretch of Highway 84 as "a windy mountain road," with "[l]ots of switchbacks . . . [and] very few straightaways."  Some portions of the road have no shoulder, including near where the crash occurred.  The officer testified that the area was "a well-known area for motorcycle crashes and crashes in general."  He also testified that the road was "heavily" used by cyclists on the weekends.

The collision happened on a "short straightaway" between two curves.  At that point, Highway 84 has one lane in each direction with solid double yellow lines that indicate no passing.  The speed limit is 45 miles per hour, and a sign advising that upcoming turns should be taken at 30 miles per hour is located shortly before the scene in the direction Doane was travelling.[2]  A CHP sergeant opined that the "safe speed" at that point was "45 miles an hour, the posted limit there."  He explained that this opinion was also based

---

[2] Evidence was presented that although the sign showed two curves and there are more curves than that between the sign and the scene, the sign nevertheless applies to all subsequent curves "until [one] see[s] another advisory sign for a specific curve."

3

on other "physical facts of the road and the environmental factors around the road," including the line of sight as one goes around the curve. He testified that "200 feet would be about the shortest portion" a driver could see when doing so.

Jouaux's friend estimated that at the time of the crash, his and Jouaux's cars were travelling around 35 to 40 miles per hour and he was 50 to 100 meters behind Jouaux. As the friend made the turn onto the straightaway where the collision occurred, he "saw [a] wide pickup truck sliding around the corner coming in [his and Jouaux's] direction" at "a relatively high speed." The friend testified, "[I]f I had to guess [the speed was] more than 50, 55, 60 [miles per hour] maybe," which he deemed a "conservative estimate." He also testified that the truck was going "probably not more than 70" miles per hour.

The friend testified that the truck "was oversteering, meaning that the rear end was sliding and the driver was compensating . . . , so it was basically sliding around the corner." As "the road straightened the truck kept on turning," and it "went over into the opposing lane." The friend saw the truck hit Jouaux's car, which had remained in the eastbound lane, "almost head-on." After the impact, the truck, which weighed about three times more than the Honda, continued to move forward while the Honda "bounced back and spun around up against the eastern embankment of the road." The truck then "basically ran over the Honda and flipped," coming to rest "upside down on [the eastbound] side of the road."

After the crash, Jouaux's friend approached the Honda, which "was very seriously damaged" and "had no roof . . . on the driver's side." Jouaux's friend performed CPR on Jouaux until a fire crew arrived, and shortly afterward Jouaux was pronounced dead. An autopsy showed that he died

4

from extensive internal injuries. No alcohol or drugs were detected in his blood.

### B. *Doane's Post-crash Behavior*

The first vehicle travelling eastbound to arrive at the scene after Jouaux's friend was driven by Kevin M., who was with his girlfriend and two sons. Kevin M. got out of his vehicle and approached the truck, a Ford F-250, to see if anyone was inside. The driver, Doane, indicated that he was stuck inside, but shortly thereafter he exited the truck without assistance. Doane's hand was "mangled" and bleeding, and he seemed "[i]ncoherent, dizzy, [and] . . . spacey." Kevin M. guided Doane to the side of the road and went to get paper towels for his hand.

When Kevin M. returned to Doane, he wrapped Doane's hand in the paper towels. Doane began to say, "I need to go off and die. I need to go off and die." Several other witnesses who had come upon the crash also heard Doane make similar statements about needing or wanting to die.

Kevin M. smelled alcohol on Doane's breath as the other man was speaking. One of Kevin M.'s sons also testified that Doane had a "strong" smell of alcohol, and "[i]t didn't smell like beer or wine or something, it smelled like hard alcohol." Kevin M.'s girlfriend, on the other hand, testified that she did not smell alcohol on Doane and did not observe anything else to indicate he was under the influence of alcohol.

Kevin M. also testified Doane did not appear "to be unsteady or have an impaired balance." Another witness, however, described Doane as appearing "disoriented, confused, upset," and "a little off balance." That witness's husband described Doane as "dazed" and "wandering around" in a circle. A fourth witness testified that Doane "looked like [he was] aware of the

5

situation, kind of like in disbelief, but then also like discombobulated" and "out of it."

After Doane said he needed to die, Kevin M. put his hand on Doane's chest and said, "No, you don't want to do that. Sit down." In a "stern" voice, Doane, who now seemed "more in control, more aware," told Kevin M. he "need[ed] to let him go." Doane walked away, and Kevin M. did not try to prevent him from doing so, although other witnesses told Doane to stop.

Kevin M.'s son testified that after Doane walked away from the scene, he "kind of looked back and stumbled. . . . [H]e wasn't in the best condition to be perfectly running off, but he stumbled off into the woods as quickly as he could." Another witness also testified that Doane walked away quickly like he was "in a hurry." A different witness, however, testified that Doane "kept on slowly, slowly walking away and into the . . . forest" after being asked to stop.

After some time passed, Kevin M. and his sons attempted to find Doane by following his "blood tracks." They followed the trail to a nearby creek, where it became "pretty apparent that [Doane] had crossed the creek." The sheriff's department subsequently made a brief attempt to track Doane with canines, but he avoided detection. Apparently, he was able to walk home to his San Gregorio apartment, approximately three miles west of the crash scene, where he had lived for about three years.

The following day, Doane took a taxi to a Redwood City hospital. He was admitted around 2:00 p.m., approximately 18 hours after the crash. The taxi driver who transported him testified that he "looked like he was out of it" and was "moaning in pain" during the ride. Doane had suffered a "degloving injury" to his hand, meaning that "the skin [was] stripped off exposing underlying muscle or tendon or bone." He also had a "deep laceration" on his

6

wrist, which was dislocated, and a fractured finger. Meanwhile, law enforcement had "dispatch check the local hospitals" for anyone with a serious hand injury. Shortly after Doane arrived at the hospital, he was arrested.

### C. *Evidence Relating to the Causes of the Crash*

#### 1. The truck's condition and operation

Evidence involving the Ford truck's registration and Doane's driving record tended to suggest that Doane, who was employed as an auto mechanic, had owned and operated the vehicle since at least 2007. The truck's brakes were in good working condition, and there were no indications that brake failure occurred. Given the truck's condition, the antilock braking system could not be tested. The brake fluid was dirty, which could indicate contamination with another material. There were no other indications that any such contamination affected the braking system, however, and the contamination could have occurred during the crash. The suspension and steering systems were working normally.

No data from the truck's computer was accessible, and it would not have been helpful given the limits in what it could record. The truck's airbags did not deploy during the collision, however, which indicated there was no more than a 14-miles-per-hour change in velocity at the time of impact. A defense expert in accident investigation and reconstruction opined that the vehicle was going about 45 miles per hour at the time of the crash.

The truck had three All Terrain, larger tires of the same type and one standard-sized tire, the right rear tire. A defense expert testified that the All Terrain tires were "[a]t least two size[s] bigger" than what Ford recommended be placed on that vehicle. A label inside the truck's driver's door indicated the recommended size of tire and, as paraphrased by the

7

expert, cautioned that "if you use high performance tires or larger tires[,] . . . that can affect the handling of the vehicle which ultimately can [lead] to a loss of control or other issues," including "roll over and serious injury."

The three All Terrain tires had a tread depth of 2/32 of an inch and were "worn down to the wear indicators," which indicate "that the tires are nearing [the] end of their useful life and need to be replaced." The fourth tire had a tread depth of 12/32 of an inch. Under California law, the minimum tread depth required for a passenger vehicle is 1/32 of an inch. (Veh. Code, § 27465, subd. (b)(1).)

The CHP sergeant testified that worn tire tread could contribute to the loss of grip on the road when a vehicle travels around a curve, but he also stated that it was "unlikely" that the different types of tires on the truck and their condition played a role in the truck's losing control. A defense expert, however, opined that the tires' differences in size, tread wear, and inflation could contribute to a driver losing control of the vehicle.

The CHP sergeant testified that "a vehicle traveling down the roadway through a curve should be able to maintain the arch of the curve, unless it's going too fast and the tires are simply unable to grip because of the speed and it travels off the roadway," which was a scenario consistent with a friction mark left on the road at the scene. This scenario was also consistent with Jouaux's friend's testimony, as "a speed of 50 to 60 miles an hour . . . would be enough for a vehicle like [the truck] to not be able to travel through the curve" and the friction mark could have been left during oversteering. The sergeant also opined that the steering motion that resulted in the truck crossing the double yellow lines was unsafe.

2.    Doane's alcohol consumption and the text message

Around 12:30 p.m. on the day of the crash, Doane purchased a few groceries, including a six-pack of Sierra Nevada beer, at a store east of the crash site.  Doane's landlord testified that when he cleaned out the apartment sometime after Doane's arrest, there were between one and five bottles of Sierra Nevada beer in the refrigerator.  No alcohol containers were located in Doane's truck after the collision, however.

Doane did not have a blood sample taken for alcohol testing, given the amount of time between the crash and his arrest.  A forensic toxicologist testified that the odor of alcohol cannot be reliably correlated with a person's blood alcohol level or degree of impairment, meaning that the witness observations of alcohol on Doane's breath at the scene could not be used to determine his level of intoxication.

Phone records showed that a text message was transmitted to Doane's cell phone at 6:54 p.m. on the night in question, one minute before the first 911 call was made.  The phone did not receive any other text messages or calls for two hours before that, and the next incoming communication was a text message around noon the following day.  Doane himself did not send any texts or make any calls during the relevant time period.

D.    *Procedural History*

Doane was charged with one count of gross vehicular manslaughter, a felony, with an accompanying enhancement for fleeing the scene, and a separate felony count of leaving the scene of an accident.[3]  The jury convicted

---

[3] The charges were brought under Penal Code section 192, subdivision (c)(1) (gross vehicular manslaughter), and Vehicle Code section 20001, subdivision (a) (leaving the scene).  The enhancement accompanying the vehicular-manslaughter count was alleged under Vehicle

9

him of both counts and found true the allegation that he fled the scene. The trial court sentenced him to a total term of 11 years in prison, composed of the upper term of six years for gross vehicular manslaughter and a consecutive term of five years for the accompanying enhancement. The court imposed and stayed the midterm of three years for the separate count of leaving the scene.

## II.
### DISCUSSION

A.    *Sufficient Evidence Supported the Conviction for Gross Vehicular Manslaughter.*

Doane claims his conviction for gross vehicular manslaughter must be reversed because there was insufficient evidence of gross negligence and proximate causation. We disagree.

### 1.    General legal standards

Doane was convicted of gross vehicular manslaughter under section 192, subdivision (c)(1), which prohibits "driving a vehicle in the commission of an unlawful act, not amounting to a felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence." The required act must either be "a misdemeanor or infraction" or "a negligent act." (*People v. Thompson* (2000) 79 Cal.App.4th 40, 53.) The jury was instructed on the infractions of violating the basic speed law, making an unsafe turning movement, and crossing the double yellow lines, as well as the

---

Code section 20001, subdivision (c). All further statutory references are to the Penal Code unless otherwise noted.

lawful act that might cause death of "driving at a speed not in violation of the basic speed law."[4]

"Gross negligence is the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences. [Citation.] 'The state of mind of a person who acts with conscious indifference[] to the consequences is simply, "I don't care what happens." ' " (*People v. Bennett* (1991) 54 Cal.3d 1032, 1036.) In determining whether a defendant acted with gross negligence, "[t]he test is objective: whether a reasonable person in the defendant's position would have been aware of the risk involved." (*Ibid.*) A defendant's particular mind state, however, can also be relevant. "In determining whether a reasonable person *in [the] defendant's position* would have been aware of the risks, the jury should be given relevant facts as to what [the] defendant knew, including [the defendant's] actual awareness of those risks." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1205.) Thus, while a defendant who lacks awareness of the risk may still be grossly negligent "if a reasonable person would have been so aware," a defendant who "actually appreciated the risks involved in a given enterprise, and nonetheless proceeded with it," could still be found grossly negligent even if "a reasonable person in [the] defendant's position would [not] have recognized the risk." (*Ibid.*, italics omitted.)

In a vehicular manslaughter case, "gross negligence cannot be shown by the mere fact of driving under the influence or violating the traffic laws, but can be shown by the overall circumstances of the defendant's intoxication and the manner in which the defendant drove." (*People v. Von Staden* (1987)

---

[4] The infractions were alleged under Vehicle Code sections 22350 (basic speeding law), 22107 (unsafe turning movement), and 21460 (crossing double yellow lines). The jury was also instructed that it had to agree on the same predicate act to find Doane guilty.

11

195 Cal.App.3d 1423, 1428; accord *People v. Hansen* (1992) 10 Cal.App.4th 1065, 1075 [factfinder must consider "relevant aspects of [the] defendant's conduct resulting in the fatal accident"].) The grossly negligent behavior must be a proximate cause of the victim's death to support a conviction. (*People v. Pike* (1988) 197 Cal.App.3d 732, 748; see § 192, subd. (d).)

A lesser included offense of gross vehicular manslaughter under section 192, subdivision (c)(1), "is vehicular manslaughter with ordinary negligence, a misdemeanor that requires only a finding of ordinary negligence. (§ 192, subd. (c)(2).)" (*People v. Kumar* (2019) 39 Cal.App.5th 557, 564.) Ordinary negligence, a "lower standard of negligence" than gross, " 'is the failure to use reasonable care to prevent reasonably foreseeable harm to oneself or someone else. A person is negligent if [the person] . . . does something that a reasonably careful person would not do in the same situation.' " (*Ibid.*) As mentioned above, Doane did not contest that he acted with ordinary negligence. Thus, we agree with him that the relevant issue is "whether the evidence was sufficient to prove . . . that his negligence was of the aggravated variety."

In evaluating a claim that a conviction lacks sufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) "Substantial evidence" is evidence that is " ' "reasonable . . . , credible, and of solid value" ' " (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363), and a reasonable inference from the evidence

" ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)  Reversal is not required unless " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508; see *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1171 (*Nicolas*).)

> 2.    There was substantial evidence of gross negligence.

Doane identifies several factors on which the prosecutor relied to establish gross negligence and argues that "[v]iewed individually or collectively," they were insufficient.  We conclude there was substantial evidence that Doane was speeding, that the road conditions required a greater degree of care, that his truck's tires were unsafe, and that he drank alcohol before driving, and the jury could have properly determined from these circumstances that he acted with gross negligence in causing Jouaux's death.  Accordingly, we do not address whether other evidence, including that Doane received a text message right before the crash and later fled from the scene, also constituted substantial evidence of gross negligence.

> a.    Speed and road conditions

Doane argues that there was insufficient evidence "from which the jury could have inferred [he] drove the vehicle above the legal or safe speed limit at the time of the collision."  He claims "there was nothing uniquely treacherous about the road . . . [or] the curve he took before the collision," and the evidence he "was exceeding the speed limit and safe speed for the curve . . . was speculation."  He also claims that even if he exceeded a safe speed, "a reasonable person would [not] find exceeding the 45-miles-per-hour speed limit by 5 or even 10 miles per hour poses a risk of harm to others" such that doing so was grossly negligent.

13

We begin by agreeing with Doane that merely exceeding the speed limit does not establish gross negligence.[5] (*People v. Von Staden, supra,* 195 Cal.App.3d at p. 1428.) There was substantial evidence that he exceeded the speed limit by significantly more than 10 miles per hour, however. A CHP officer testified that the speed limit of 30 miles per hour for upcoming curves applied to the curve where Doane lost control. And Jouaux's friend testified that he thought the Ford truck was going "more than 50, 55, 60 maybe, but it could be considerably more." Thus, even if we agreed with Doane that any evidence suggesting he was going more than 50 miles per hour was speculative, there was evidence that he was traveling at least 20 miles per hour over the applicable speed limit.

In addition, there was substantial evidence of road conditions that made Doane's speeding more dangerous than it otherwise would have been. Although, as Doane observes, the light and weather conditions were favorable, the evidence that the road was only one lane in each direction and "windy" supported the conclusion that a reasonable driver would exercise more care, and thus drive more slowly, than might otherwise be necessary under other circumstances. There was also testimony that cyclists often used the road, particularly on weekends. As a local, Doane presumably was aware of this. Thus, even though "there was no evidence of [bicycle] traffic on the day of or at the time of the collision," the jury could have concluded that a

---

[5] While Doane admits he committed the non-speeding Vehicle Code violations on which the prosecutor relied as predicate acts—crossing the double yellow lines and making an unsafe turn—he argues they were insufficient to demonstrate gross negligence. Since we conclude that there was sufficient evidence that he was speeding and this was grossly negligent under the circumstances, we do not address whether the other violations were also committed in a grossly negligent manner. (See *People v. Cravens, supra,* 53 Cal.4th at p. 508.)

14

reasonable person in Doane's position would have exercised particular caution driving on the road on a holiday weekend. In short, the evidence that Doane exceeded the speed limit by a fair amount in circumstances requiring particular caution was a sufficient basis on which the jury could find he drove in a grossly negligent manner.

### b. The condition of the truck's tires

Doane claims there was insufficient evidence that the size and condition of his truck's tires posed a danger, much less that "driving with them constituted gross negligence." He points out that while the tread was worn on three tires, it was still "of legal depth," and the evidence "suggested a mere possible danger" in having tires of different sizes. Thus, he claims, driving with these tires did not amount to "an extreme departure from an ordinary standard of care."

This argument improperly discounts the evidence presented that both the worn tread and the tires' sizes were dangerous. The CHP sergeant agreed that "tires with worn tread" are a "factor that can contribute to a loss of grip on the roadway in a curve." Similarly, a defense expert indicated that the three worn tires, which he characterized as "in poor condition," could have been "a factor that could have contributed or exacerbated [Doane's] loss of control" of the truck. As for the evidence that the All Terrain tires exceeded the manufacturer's recommended size and the sticker warning about using oversized tires, we cannot agree with Doane that "[t]his evidence . . . did not rise to the level of substantial evidence of an actual danger." As the Attorney General points out, the sticker cautioned "that using improperly sized tires could lead to 'loss of control, roll over[,] and serious injury,' which is exactly what happened here."

15

Moreover, in arguing that his use of worn and oversized tires was not grossly negligent, Doane overlooks evidence of other factors that made his decision to drive with such tires particularly reckless. He was an auto mechanic, meaning he was in a better position to appreciate the danger of driving with such tires. The truck was large, making it more likely, as the sticker cautioned, to cause serious injury in a crash. In addition, Doane had owned the truck for several years and was presumably familiar with Highway 84, having lived in San Gregorio for at least three years. Thus, even if we assume that driving with worn but legal tires or oversized tires is not negligent standing alone, we agree with the Attorney General that a jury could reasonably find that driving on worn, oversized tires in a large truck at a high speed around a curve was grossly negligent.

### c. Alcohol consumption

Although Doane admits there was evidence he drank alcohol before the crash, he claims there was insufficient evidence that it impaired his driving or rendered his driving grossly negligent. The argument fails.

Doane was charged with gross vehicular manslaughter under section 192, subdivision (c)(1), not the separate offense of gross vehicular manslaughter while intoxicated under section 191.5, subdivision (a). Although the latter offense requires a finding that the defendant was legally intoxicated, the former does not. Thus, "the relevant question is not whether [Doane] was impaired at the time of the accident, but whether [he] was acting with gross negligence." (*People v. Ho* (2018) 26 Cal.App.5th 408, 414.) Although no evidence of Doane's blood-alcohol level was presented, the jury could nevertheless rely on the evidence that he had been drinking and that it affected him to some degree to conclude that he acted with gross negligence.

16

Specifically, there was substantial evidence that Doane had consumed both beer and hard alcohol, based on his purchase of beer earlier that day, his landlord's testimony about the beer in his apartment, and the testimony of witnesses at the scene who smelled alcohol on him. There was also substantial evidence that Doane was impaired, given witness testimony describing him as "dazed," "stumbling," and other similar adjectives. We agree with the Attorney General that, although such testimony could also support the conclusion that Doane was impaired because he had just been in a serious crash, "it was up to the jury to determine the facts, and intoxication was a reasonable inference." In turn, the jury could reasonably determine that driving a vehicle after consuming alcohol was particularly dangerous in light of the other circumstances discussed above, including the road conditions. Thus, there was sufficient evidence that Doane acted with gross negligence by driving after drinking alcohol.

> 3. Substantial evidence established that Doane's grossly negligent conduct caused Jouaux's death.

Finally, Doane claims that, "to the extent any of his conduct was grossly negligent, there was no proof that grossly negligent conduct was the proximate cause of the collision." He argues that there was insufficient evidence to prove, among other things, that he "drove onto the shoulder due to reckless speed as opposed to a momentary lapse of attention or mere inadvertence"; that "the tires were the proximate cause of the accident"; or that his "alcohol consumption contributed to the accident or even impaired his driving in the least."

Doane misapprehends the concept of causation in this context. Under section 192, subdivision (d), a defendant cannot be convicted of gross vehicular manslaughter unless the victim's death was "a proximate result of the commission of an unlawful act, not amounting to a felony, or of the

17

commission of a lawful act which might produce death, in an unlawful manner." In turn, the predicate act must be committed with gross negligence. (§ 192, subd. (c)(1).) At least where, as here, the prosecution relies on numerous circumstances to demonstrate the defendant committed the act with gross negligence, there is no requirement that each of those circumstances be proven to have proximately caused the death.

For example, in *Ochoa*, our state Supreme Court concluded there was sufficient evidence of gross negligence where the defendant, "(a) having suffered a prior conviction for driving under the influence of alcohol, (b) having been placed on probation, (c) having attended traffic school, including an alcohol-awareness class, and (d) being fully aware of the risks of such activity," nevertheless drove while intoxicated, sped, and made other dangerous driving maneuvers. (*People v. Ochoa*, *supra*, 6 Cal.4th at pp. 1207–1208.) Obviously, the facts that the defendant had a previous DUI conviction and attended traffic school did not "cause" the victim's death. Rather, they demonstrated that in committing the acts that did cause the death, the defendant was aware of the risks yet "exercised so slight a degree of care as to exhibit a conscious indifference or 'I don't care attitude' concerning the ultimate consequences of his actions." (*Id.* at p. 1208.)

Likewise, the jury here could infer that Doane acted with gross negligence because, after drinking alcohol, he chose to drive a large truck with unsafe tires at a significant speed on a twisting, one-lane road, ultimately losing control of the truck and thereby causing Jouaux's death. Substantial evidence supported the conviction for gross vehicular manslaughter.

18

B.	*The Prosecutor Erred in Explaining the Concept of "Innocence" as Used in the Instruction on Circumstantial Evidence.*

Relying on CALCRIM No. 224, Doane's trial counsel argued that if the circumstantial evidence could support two reasonable conclusions, that Doane drove with ordinary negligence or gross negligence, the jury must conclude he acted with ordinary negligence. Doane argues that the prosecutor erred by arguing in response that CALCRIM No. 224's reference to "innocence" applies only to actual innocence, not guilt of a lesser included offense. We agree that the prosecutor erred.

1.	Additional facts

The jury was instructed in relevant part under CALCRIM No. 224 that, "before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence."

In closing argument, Doane's trial counsel argued to the jury that it should "take the totality of the evidence surrounding alcohol and take it through the filter of the circumstantial evidence instruction [i.e., CALCRIM No. 224]. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. [¶] . . . [T]he largest circumstantial evidence issue, and really the heart of this case is whether the circumstantial evidence about everything shows that Mr. Doane was driving and caused this accident as a result of ordinary negligence or caused the accident as a result of gross [negligence]."

19

Subsequently, defense counsel argued, "[I]f you have two reasonable conclusions and one points to gross negligence and one points to ordinary negligence [CALCRIM No. 224] requires you to adopt or accept the conclusion that points to ordinary negligence. Ordinary negligence is innocence for [the] purpose of making the determination on the gross negligence instruction."

The prosecutor began her rebuttal by responding to these arguments, stating, "[W]hat strikes me as one of the most important concepts to []review with you as the jury is the concept of circumstantial evidence. Strikes me as odd that at the very end of the defense closing argument you are asked to follow these instructions exactly as the Court reads them, yet there was an encouragement to follow an instruction about circumstantial evidence that as far as I can tell is plucked out of thin air." After restating the rule that "if you can draw two or more reasonable conclusions from the circumstantial evidence, [and] one of those reasonable conclusions to innocence and the other to guilt, you must accept the one that points to innocence," she continued, "[T]his is where I think the defense has asked you to pull a lot from thin air. First of all, the use of the word innocence. If one of the reasonable conclusions points to innocence[,] that is the defendant didn't do anything wrong, clean hands. This rule does not say if one conclusion points to the ordinary negligence theory and the other points to the gross negligence theory you have to pick the ordinary negligence theory conclusion."

The defense immediately objected that the prosecutor's argument "misstate[d] the law," and the trial court overruled the objection. The prosecutor then concluded, "[The instruction] doesn't say that. This says innocence. So if a conclusion points to both guilt theories, then go with that, only if a conclusion points to innocence. There is no distinction in this instruction between the levels of negligence."

2. Analysis

Prosecutorial error "occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853–854.) " '[A] defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith.' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 438; *Daveggio*, at p. 853.)

" ' "[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements." ' " (*People v. Lloyd* (2015) 236 Cal.App.4th 49, 62.) When a claim of prosecutorial error " 'focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

We agree with Doane that the prosecutor misstated the law in explaining CALCRIM No. 224 to the jury. Specifically, we agree that "innocence" under CALCRIM No. 224 refers to being not guilty of the charged crime, not to being not guilty of the charged crime *and* any lesser included offenses. (See *People v. Wade* (1995) 39 Cal.App.4th 1487, 1493 [" '[i]nnocence' in this jury instruction is used simply to connote a state of evidence opposing guilt"].) "[W]hen the evidence is sufficient to support a

21

finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense." (*People v. Dewberry* (1959) 51 Cal.2d 548, 555; see § 1097.) As applied here, this principle means that if the circumstantial evidence supported a reasonable conclusion that Doane acted with gross negligence but also supported a reasonable conclusion that he acted with only ordinary negligence, the jury could find him guilty only of misdemeanor vehicular manslaughter.

In arguing otherwise, the Attorney General misapprehends defense counsel's argument below to have been that "if the circumstantial evidence showed that [Doane] acted with *both* [ordinary] negligence and gross negligence," the jury had to find Doane guilty of only the lesser offense. (Italics added.) The Attorney General claims that this supposed argument was incorrect, because by finding that Doane acted with gross negligence, the jury also necessarily found that he acted with at least ordinary negligence, but it was still required to return a verdict of guilty on the greater offense. We agree, of course, that the jury was not required to convict Doane of only the lesser offense if it concluded beyond a reasonable doubt that he acted with gross negligence, but that is not what defense counsel urged it to do. Rather, the more sensible interpretation of defense counsel's argument—that the jury should convict of only the lesser offense if it could draw "two reasonable conclusions and one points to gross negligence and one points to ordinary negligence"—is that counsel was arguing that the jury could not convict Doane of gross negligence if it drew one conclusion pointing to gross negligence and another pointing to *only* ordinary negligence. As we said above, this was a correct statement of the law. The prosecutor directly

contradicted this correct principle, however, by telling the jury the instruction "[did] not say if one conclusion points to the ordinary negligence theory and the other points to the gross negligence theory you have to pick the ordinary negligence theory conclusion."

We also conclude that there was a " 'reasonable likelihood' " the jury interpreted the prosecutor's remarks " 'in an objectionable fashion.' " (*People v. Smithey*, *supra*, 20 Cal.4th at p. 960.) Specifically, it is quite possible that the jury believed it could find Doane guilty of gross vehicular manslaughter even if the circumstantial evidence also supported a reasonable conclusion that he acted with only ordinary negligence. This is because under the prosecutor's interpretation of CALCRIM No. 224, a reasonable conclusion that Doane acted with only ordinary negligence was not a conclusion "point[ing] to innocence" and therefore not one the jury was required to select over a reasonable conclusion that he acted with gross negligence. Moreover, by overruling Doane's objection to the prosecutor's argument, the trial court conveyed to the jury that the prosecutor was correct and the defense argument to which she was responding was incorrect, increasing the risk that the jury would accept the prosecutor's misstatement of the law.

The Attorney General claims that there was no reasonable likelihood that the jury improperly understood the prosecutor's argument, because the parties' arguments and the trial court's instructions left no doubt that the jury's "main task was to choose between ordinary and gross negligence." Thus, the Attorney General argues, "it [was] inconceivable that the jury thought that the prosecutor was arguing that it could find [Doane] guilty of gross vehicular manslaughter, or it could find him not guilty, but it could not find him guilty of the lesser offense of misdemeanor vehicular manslaughter." But the problem with the prosecutor's argument was not that it conveyed

that the jury simply could not convict Doane of the lesser offense. Rather, the problem was that the argument wrongly conveyed that the jury did not need to convict Doane of only the lesser offense *if* it concluded that one reasonable conclusion from the circumstantial evidence was that he acted with only ordinary negligence. Thus, the jury's general understanding that it had to choose between ordinary and gross negligence would not have prevented it from misapplying the prosecutor's remarks.

### C. *The Trial Court Erred in Answering the Jury's Question Involving Doane's Post-collision Behavior.*

Doane also claims that the trial court erred in responding to the jury's question about whether it could consider his post-crash behavior to establish gross negligence even if "the accident and conditions leading up to" the crash constituted only ordinary negligence. We agree.

#### 1. Additional facts

The jury sent the following inquiry to the trial court: "Can we consider the action of fleeing the scene after the accident and those behaviors as gross negligence, even if we consider the accident and conditions leading up to it as ordinary negligence?" Doane's trial counsel interpreted the question to be whether the jury could "use . . . the fact there is fleeing and find that [Doane] was grossly negligent at that point and use that to satisfy the gross negligence for [the manslaughter count]." Counsel stated he thought the answer to that question was "no, that the time for assessing the ordinary or gross negligence for [that count] is the time of the act, not his time of fleeing."

The prosecutor disagreed that the trial court should answer the jury's inquiry in the negative. She proposed that instead, the court should refer the jury to CALCRIM No. 372 on flight, explaining, "Within that instruction it tells the jury that [it is] to decide the meaning and importance of the flight behavior and evidence of flight cannot prove guilt in and of itself. I think if

24

we go beyond that and we start speculating about what the jury's going to do with the flight evidence and base [the] instructions to [it] based on our speculation[,] we're in dangerous territory."

Defense counsel responded, "I think that there is a correct legal answer that we can give . . . beyond just referring [the jurors] to the flight instruction, and I think it really goes to the [u]nion of [a]ct and [i]ntent issue and they're asking whether they can base intent on something that occurred after the end of the act, and I think the answer to that is clearly no. They're saying can we consider the action of fleeing the scene and those behaviors as gross negligence, and I think the law is that gross negligence or ordinary negligence is the kind of act." Counsel argued that if the court merely referred the jurors to the flight instruction, it would be "inviting them to consider [the flight] evidence for a purpose it cannot be considered for."

The prosecutor responded that Doane's "behavior after the incident [was] circumstantial evidence of the intent at the time." Specifically, the evidence of flight bore on "his regard for human life and the degree to which he cares about the consequences of his actions," relevant issues for determining whether Doane acted with gross negligence. Defense counsel did not disagree with this point, but he reaffirmed his interpretation of the jury's inquiry as "suggest[ing] that [the jurors] . . . already determined the mental state at the time of the offense and they're not looking at it for that purpose. They're looking at it to judge [Doane's] mental state after the accident even if they think he only had ordinary negligence at the time of the accident."

Ultimately, the trial court decided it was appropriate to re-refer the jury to the instructions on flight, ordinary negligence, and gross negligence. Expressing a preference for giving jurors "fairly open-ended answers to questions like this so that we preserve their right to factually decide what's

25

happening," the court stated, "[T]he easy answer would be to say if you determined the flight occurred it is up to you to decide the meaning and importance of that conduct, just like the [flight] instruction says, and leave it at that."  It declined defense counsel's request to re-refer the jury to the instruction on the union of act and intent as well, stating, "I don't think that's really what the issue is here.  [The jurors are] . . . struggling with how to fit the flight piece into their analysis in deciding whether the conduct was gross or ordinary negligence.  And so this is a very important question to them obviously, and important to Mr. Doane and the People, and I don't want to in any way tilt the answer toward either side."

Accordingly, over Doane's continuing objection, the trial court sent the following written response to the jury's inquiry:  "The jury must determine if there was gross or ordinary negligence.  See CALCRIM Instructions [Nos.] 592 [and] 593, and then re-refer to CALCRIM [No.] 372 wherein it states[,] 'If you conclude the defendant fled it is up to you to decide the meaning and importance of that conduct.' "

2.     Analysis

A trial court is required to " 'instruct[] the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case.' " (*People v. Ramirez* (2021) 10 Cal.5th 983, 1035.)  A court also has "a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*).)  This obligation arises under section 1138, which provides that if deliberating jurors "desire to be informed on any point of law arising in the case, . . . the information required must be given" to them in court.

Thus, " '[w]hen a jury asks a question after retiring for deliberation, ". . . [s]ection 1138 imposes upon the court a duty to provide the jury with

26

information the jury desires on points of law." [Citation.] But "[t]his does not mean the court must always elaborate on the standard instructions." ' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016 (*Lua*).) Rather, if " 'the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Dykes*, *supra*, 46 Cal.4th at p. 802.) On the other hand, "it is generally not acceptable for a trial court to 'merely repeat for a jury the text of an instruction it has already indicated it doesn't understand,' " and "the court 'must at least *consider* how it can best aid the jury.' " (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887.)

In general, errors under section 1138 are reviewed for an abuse of discretion. (*Lua*, *supra*, 10 Cal.App.5th at p. 1016.) As *Franklin* explained, however, the abuse-of-discretion standard of review applies only to "the decision to provide [or not provide] further instructions in response to an inquiry." (*People v. Franklin*, *supra*, 21 Cal.App.5th at p. 887, fn. 4.) "If a supplemental instruction is given, . . . its correctness presents a question of law that we review de novo." (*Ibid.*; see *People v. Posey* (2004) 32 Cal.4th 193, 218.) In determining whether the trial court correctly instructed the jury, "the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 525–526; see *Dykes*, *supra*, 46 Cal.4th at pp. 804–805.)

Doane claims "the trial court committed legal error by permitting the jury to find that [his] merely negligent driving was grossly negligent based

solely on his flight from the scene." The Attorney General responds that the instructions given were correct, and the court did not abuse its discretion by deciding "to refer the jury back to the pattern instructions." Doane has the better argument.

To begin with, we agree with Doane that the question at issue amounted to the jury's asking whether, "if [the jury] believed the manner in which [he] drove his truck reflected only ordinary negligence, . . . his subsequent flight from the scene [could] provide proof of gross negligence so as to permit a guilty verdict for the felony offense." Crucially, the jury did not ask only whether it could "consider the action of fleeing the scene after the accident and those behaviors as gross negligence," which might reasonably be interpreted as a question about whether it could rely on post-crash acts to infer that Doane acted with gross negligence in causing the collision. If that had been the jury's question, we would agree with the Attorney General that the answer to it was yes. (See *Nicolas*, *supra*, 8 Cal.App.5th at p. 1172.) For example, the jury could have relied on Doane's failure to aid Jouaux to infer that Doane acted with a conscious disregard for human life before the crash.

But the jury's question did not stop there. Instead, the jury went on to ask whether it could consider Doane's post-crash behavior to establish gross negligence *even if [it] consider[ed] the accident and conditions leading up to it as ordinary negligence.* (Italics added.) In our view, the italicized phrase is most reasonably interpreted as positing the jury's premise that Doane acted with ordinary negligence in causing the crash. Thus, as a whole, the question asked whether the jury, if it believed that Doane's actions before the crash were merely negligent, could nevertheless find Doane guilty of gross vehicular manslaughter based on his grossly negligent post-crash behavior.

28

The answer to that question is clearly no. "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." (§ 20.) Although "[g]ross vehicular manslaughter has been characterized as a general intent crime[,] . . . the crime more precisely entails the confluence of two different mental states: general intent in the driving of the vehicle, and gross negligence while committing a traffic violation . . . or gross negligence in the commission of a lawful act not amounting to a traffic violation." (*Nicolas*, *supra*, 8 Cal.App.5th at p. 1173.) Thus, the unlawful or unsafe act underlying a conviction for gross vehicular manslaughter must be committed with gross negligence. Here, that meant the jury had to conclude that when Doane committed the predicate act or acts—driving at an unlawful or unsafe speed, crossing the double yellow lines, and/or making an unsafe turning movement—he did so with gross negligence.

We therefore turn to whether the trial court properly answered the jury's question. Doane does not contest that the instructions on flight, ordinary negligence, and gross negligence to which the court re-referred the jury were correct as originally given. And we recognize that in many situations, a court's decision to re-refer the jury to correct instructions will not constitute an abuse of discretion under section 1138. (See *Dykes*, *supra*, 46 Cal.4th at p. 802; see also *People v. Beardslee* (1991) 53 Cal.3d 68, 97 ["comments diverging from the standard [instructions] are often risky"].) But the question at issue suggested that the jury misunderstood the governing law, and we are not convinced that merely re-referring to instructions already given in such a circumstance is adequate to " 'clear up any instructional confusion [the jury] expressed.' " (*Dykes*, at p. 802.)

29

Ultimately, we need not resolve this issue, because the trial court did not just re-refer the jury to the instructions already given on ordinary negligence, gross negligence, and flight. Rather, the court directed the jury to the first two instructions and then re-referred it to only a *portion* of the flight instruction. Specifically, the court told the jury to "re-refer to CALCRIM [No.] 372 wherein it states[,] 'If you conclude the defendant fled it is up to you to decide the meaning and importance of that conduct.' " In doing so, the court removed from focus the two other main parts of CALCRIM No. 372 as given: that flight "may show that [Doane] was aware of his guilt" and that "evidence that [he] fled cannot prove guilt by itself."

Those other two parts of CALCRIM No. 372 are crucial, and particularly so in light of the jury's question. Our state Supreme Court has explained that the flight instruction, " 'as the jury would understand it, does not address the defendant's specific mental state at the time of the offenses, or [the defendant's] guilt of a particular crime, but advises of circumstances suggesting [the defendant's] consciousness [of having] committed some wrongdoing.' [Citation.] We have repeatedly rejected the claim that the flight instruction 'permit[s] the jury to draw impermissible inferences about the defendant's mind state, or [is] otherwise inappropriate where mental state, not identity, is the principal disputed issue.' " (*People v. Loker* (2008) 44 Cal.4th 691, 705–707 [interpreting CALJIC 2.52]; see *People v. Nicolaus* (1991) 54 Cal.3d 551, 579–580 [" 'reasonable juror would understand "consciousness of guilt" to mean "consciousness of some wrongdoing" rather than "consciousness of having committed the specific offense charged" ' "].) In addition, the instruction's caution that flight is not enough to establish guilt " 'clearly impl[ies] that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense.' " (*Nicolaus*, at pp. 579–

580.)  In other words, Doane's flight from the scene was relevant to prove that he was aware he had done something wrong, but it was not relevant to establish that he was aware of or effectively admitted to having acted with gross negligence as opposed to ordinary negligence.

The trial court recognized this principle in discussing how to answer the jury's question, stating that "consciousness of guilt" did not refer to consciousness of the distinction between gross and ordinary negligence.  Yet when removed from its context, the portion of CALCRIM No. 372 informing a jury "that it is up to you to decide the meaning and importance of" a defendant's flight contradicts this principle, because it reads as broadly authorizing the jury to rely on evidence of flight for any purpose the jury deems appropriate.  Here, the jury was specifically asking whether it could convict Doane of gross vehicular manslaughter based on post-crash behavior, including flight, that it deemed grossly negligent.  Under the circumstances, we conclude there is a reasonable likelihood that the jury interpreted the court's answer to mean that it could.

In reaching this conclusion, we reject the Attorney General's argument that we "should assume that the jury reviewed the relevant instructions and realized that gross vehicular manslaughter required [it] to find that [Doane] committed the act that caused Jouaux's death '*with* gross negligence.' "  The Attorney General relies on the principle that jurors are generally assumed to be " ' "intelligent persons and capable of understanding and correlating all jury instructions which are given." ' "  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  But here, as the Attorney General recognizes, the jury's question signaled that it did *not* understand a key rule on which it had already been instructed.  Where a jury has expressed confusion about a legal principle, it is no longer appropriate to assume that the jury can just

31

"figure it out" from the instructions as a whole. Instead, the focus must be on whether the trial court's answer was sufficient to dispel the confusion. (See *Dykes*, *supra*, 46 Cal.4th at p. 802.) Here, it was not.

D.    *The Errors Were Cumulatively Prejudicial.*

To summarize, the prosecutor erred in closing argument by incorrectly explaining the instruction on circumstantial evidence, and the trial court erred in answering the jury's question about whether it could rely on post-crash gross negligence to convict. The cumulative impact of these errors was prejudicial.

As an initial matter, the parties disagree about the appropriate standard for assessing prejudice. Doane argues that the prosecutorial error rendered the trial unfair such that it violated his federal right to due process. (See *People v. Daveggio and Michaud*, *supra*, 4 Cal.5th at p. 854.) He claims that the trial court's answer to the jury's question also violated his federal rights by presenting the jury with a "legally incorrect" alternate theory of liability. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 8, 12–13.) The Attorney General, on the other hand, argues that the state-law standard for assessing prejudice applies to both claims, likening the prosecutor's improper comments to a failure to instruct on misdemeanor vehicular manslaughter. (See *People v. Breverman* (1998) 19 Cal.4th 142, 165 [failure to instruct on lesser included offense]; *Lua*, *supra*, 10 Cal.App.5th at p. 1017 [failure to answer jury's question adequately].)

We need not resolve this conflict, because we conclude that the errors were prejudicial even under the more forgiving state-law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury

32

would have reached a result more favorable to the defendant in their absence.' [Citation.]  When the cumulative effect of errors deprives the defendant of a fair trial and due process, reversal is required." (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  A cumulative-error analysis is particularly appropriate in this case because the two errors both made it less likely the jury would conclude that Doane acted with ordinary negligence. (See, e.g., *People v. Hill* (1998) 17 Cal.4th 800, 847; *People v. Holt* (1984) 37 Cal.3d 436, 458–459; *People v. Jandres* (2014) 226 Cal.App.4th 340, 361.)

Here, the question is whether it is reasonably probable that, absent the errors, at least one juror would have voted to acquit Doane of gross vehicular manslaughter.  (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520–521 [hung jury more favorable result than guilty verdict under *Watson*].)  In turn, a vote for acquittal of gross voluntary manslaughter would require a finding that Doane acted with only ordinary negligence in causing the collision.

The Attorney General claims that the errors were not prejudicial primarily because there was ample evidence of gross negligence, given Doane's "multiple substantive acts of negligence, including intoxication, speeding, looking at his cell phone while navigating a curve, and oversteering into the oncoming lane."  As discussed above, we agree there was substantial evidence of several circumstances that the jury could have relied on to conclude that Doane acted with gross negligence.  But we disagree that the evidence of gross as opposed to ordinary negligence was particularly strong. Among other things, there was significant evidence that Doane was not exceeding the speed limit by much, and there was little evidence that his alcohol consumption actually impaired his driving.

More importantly, the jury's question raised a real possibility that it believed Doane acted with only ordinary negligence in causing the crash.  But

33

the errors improperly conveyed to the jury that it (1) did *not* have to resolve its doubts between gross and ordinary negligence in favor of ordinary negligence and (2) *could* rely on post-crash gross negligence to convict even if it believed Doane acted with ordinary negligence before the crash. In this context, we conclude there is a reasonable probability that at least one of the jurors would have voted to acquit Doane of gross vehicular manslaughter had the errors not occurred.

Accordingly, Doane's conviction of gross vehicular manslaughter must be reversed. Because sufficient evidence supported that conviction, the People may retry him on this charge. But if they do not elect to do so, the judgment shall be modified to reflect a conviction of misdemeanor vehicular manslaughter. Where, as here, " ' "the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial." ' " (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1151.) Should the judgment be so modified, the enhancement for fleeing the scene under Vehicle Code section 20001, subdivision (c), must also be stricken, because it does not apply to misdemeanor vehicular manslaughter. (See Veh. Code, § 20001, subd. (c); § 192, subd. (c)(1) & (2).)

> E.     *The Trial Court Had No Duty to Instruct Sua Sponte on Unconsciousness as a Defense to Fleeing the Scene.*

Finally, Doane claims that the trial court had a duty to instruct sua sponte on a defense of unconsciousness as it pertained to the charge of fleeing the scene after the collision.[6] We are not persuaded.

---

[6] Although Doane did not request a separate instruction on unconsciousness, he did request that bracketed language involving unconsciousness be given with CALCRIM No. 2140, the instruction on

"Evidence raising a reasonable doubt as to whether the defendant was conscious at the time of acting is a complete defense to a criminal charge," so long as the unconsciousness is not due to voluntary intoxication. (*People v. James* (2015) 238 Cal.App.4th 794, 804–805 (*James*); *People v. Halvorsen* (2007) 42 Cal.4th 379, 416 (*Halvorsen*).) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' " (*Halvorsen*, at p. 417.) It is presumed "that a person who appears to act in an apparent state of consciousness is conscious. [Citation.] Therefore, the burden is on a criminal defendant to produce evidence rebutting this presumption of consciousness." (*James*, at p. 804.)

A trial court "must instruct on an affirmative defense, specifically including unconsciousness, even in the absence of a request, 'if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) A court has no obligation, however, to give an instruction that is not supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40 [" 'unsupported theories should not be presented to the jury' "].) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

---

leaving the scene under Vehicle Code section 20001. In denying the request, the trial court stated that "there was no evidence to show [Doane] was unconscious or disabled" or "in shock." Doane does not challenge this ruling on appeal.

Thus, "[i]f the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense." (*Halvorsen*, *supra*, 42 Cal.4th at p. 417.) We review de novo "a claim that a court failed to properly instruct on the applicable principles of law." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.)

Although Doane separately argues that (1) he actually relied on an unconsciousness defense and (2) substantial evidence supported the defense, the ultimate issue is whether there was sufficient evidence of unconsciousness. (See *People v. Marshall, supra*, 15 Cal.4th at pp. 39–40.) We conclude there was not.

Doane claims that the serious injury to his hand, combined with witness testimony about his demeanor immediately after the crash, "permitted the inference that [he] lacked awareness of his conduct in leaving the scene as a result of both the physical trauma from the accident and the emotional trauma of witnessing its aftermath." He also argues that "[e]ven the manner in which he left [the scene] suggested unconsciousness," as "[h]e did not run, as though fleeing the scene, but walked slowly away, more reminiscent of a robot or zombie-like character than a person cognizant of what he was doing."

In our view, the record lacks key evidence that would generally support an unconsciousness defense. To begin with, there was no expert testimony relevant to Doane's mental state after the crash. Indeed, the trial court excluded the defense's proffered testimony from an emergency room doctor who would have opined that Doane could have experienced symptoms of dissociation after the collision, and the court likewise precluded testimony that Doane was in "shock." The court concluded that testimony about potential conditions the crash may have caused in Doane lacked foundation,

36

because it was not linked to medical evidence about Doane himself, who was not seen by a doctor until the following day. Doane does not challenge these rulings on appeal.

Even if we were to agree with Doane that expert testimony is not always necessary to support an unconsciousness defense, the record also lacks any statements by Doane himself about his mind state after the collision. Rather, the only evidence that possibly supported the defense was the testimony of witnesses who observed Doane's behavior at the scene. Although Doane relies on *James* to suggest that such evidence alone may require an unconsciousness instruction, the decision does not support this proposition.

In *James*, Division Four of this court concluded that an instruction on the defense was warranted where "ample evidence" suggested the appellant, who was charged with aggravated mayhem after he bit the victim, acted unconsciously. (*James*, *supra*, 238 Cal.App.4th at pp. 800, 809–810.) The decision recited that the appellant was seen climbing the building where the victim lived and " 'crashing his head into cars and garbage cans.' " (*Id.* at p. 810.) In addition, once a police officer arrived, the "appellant was never responsive to [the officer's] commands, and was mumbling incoherently." (*Ibid.*) But unlike in this case, there was expert testimony about the appellant's mind state, which our colleagues also relied on in concluding the evidence required an unconsciousness instruction. Specifically, a clinical psychologist "testified that [the] appellant had suffered from a seizure disorder since age 17 and was experiencing a severe psychotic episode" during the incident, during which he " 'did not have awareness of what took place.' " (*Id.* at p. 798.)

37

We cannot agree with Doane that although *James* cited expert testimony in concluding there was substantial evidence of unconsciousness, the decision did not thereby "suggest[] that the instruction would not have been required but for that testimony." To the contrary, the *James* expert provided crucial testimony that the appellant experienced a medical crisis during which he was not aware of his actions. Here, in contrast, while witnesses observed behavior that was *consistent* with the conclusion that Doane was unconscious, unconsciousness was hardly the only or even a likely explanation for such behavior. Without evidence more directly illuminating Doane's state of mind, lay testimony about his demeanor at the scene was insufficient evidence from which to infer that he was, in fact, unconscious.

Moreover, while witnesses observed Doane's disorientation and confusion immediately after the crash, the evidence suggested he recovered somewhat before leaving the scene. Significantly, Kevin M. testified that when he tried to calm Doane and get him to sit down, Doane was firm in telling the other man to let him go. In addition, another witness testified that Doane seemed like "he was going somewhere and wanted to go fast" when he walked into the woods. The "purposive nature of his conduct" suggests that by the time Doane left the scene, he was aware of his actions. (*Halvorsen*, *supra*, 42 Cal.4th at p. 418.) Thus, even if lay testimony about a defendant's behavior could constitute substantial evidence of unconsciousness in a given case, the testimony here was insufficient to permit a reasonable inference that Doane was unconscious when he left the scene.

Even if the evidence had warranted an instruction on unconsciousness, the omission was harmless beyond a reasonable doubt, and there is no reasonable probability that the error affected the result. (*Chapman v. California (*1967) 386 U.S. 18, 24*; Watson, supra*, 46 Cal.2d at p. 836; see

38

*People v. Watt* (2014) 229 Cal.App.4th 1215, 1219–1220 [unsettled which standard of prejudice applies to failure to instruct on affirmative defense].) There was no question that Doane left the scene of an accident causing death without fulfilling the required duties, including rendering reasonable assistance to the victim. (See Veh. Code, §§ 20001, subd. (a), 20003, subd. (a), 20004.) Thus, as the Attorney General puts it, the only issue "was whether [Doane] knew what he was doing." We agree with the Attorney General that there was strong evidence that Doane did know what he was doing, including that he communicated clearly with witnesses at the scene, walked purposefully into the woods, and managed to make it home through rough terrain. Thus, any error in failing to instruct on unconsciousness was not prejudicial.

III.

DISPOSITION

The conviction for leaving the scene of an accident under Vehicle Code section 20001, subdivision (a), is affirmed. The conviction for gross vehicular manslaughter under Penal Code section 192, subdivision (c)(1), is reversed, and the sentence is vacated in its entirety. If the People elect not to retry Doane for gross vehicular manslaughter under Penal Code section 192, subdivision (c)(1), the judgment shall be modified to (1) reflect Doane's conviction for misdemeanor vehicular manslaughter under Penal Code section 192, subdivision (c)(2), instead of gross vehicular manslaughter and (2) strike the enhancement for fleeing the scene under Vehicle Code section 20001, subdivision (c). In the event the judgment is so modified, the trial court shall resentence Doane accordingly.

_____

Humes, P.J.


WE CONCUR:


_____

Margulies, J.


_____

Sanchez, J.


*People v. Doane*  A153709

40

Trial Court:

Superior Court of the County of San Mateo

Trial Judge:

Hon. Mark R. Forcum

Counsel for Defendant and Appellant:

David L. Polsky, under appointment by the Court of Appeal

Counsel for Plaintiff and Respondent:

Xavier Bacerra, Attorney General

Lance E. Winters, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

René A Chacón, Supervising Deputy Attorney General

David M. Baskind, Deputy Attorney General

*People v. Doane*  A153709